## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JERRY BERG,                          )
                                     )
                   Plaintiff,        )
                                     )
vs.                                  )          Case No. 12-1123-KHV-KGG
                                     )
JON L. FROBISH, *et al.*,            )
                                     )
                   Defendants.       )
_____ )

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION

Defendants' Motion for Preliminary Injunction (Doc. 179) has been referred by the District Court to the Magistrate Judge for Report and Recommendation (Doc. 196) pursuant to 28 U.S.C. § 636(b)(1)(B). The Magistrate Judge has reviewed memoranda submitted by the parties, conducted an evidentiary hearing, and heard arguments of counsel. It is **RECOMMENDED** that the District Court **GRANT** Defendants' motion **in part**.

## INTRODUCTION

Defendants' substantive claim, which forms the foundation of the present motion, is a breach of contract claim arising from language contained in Cedar Lakes Village Condominium Association (CLVCA) homeowners association documents. In the First Amended Counterclaim (Doc. 49), Defendants contend

that Plaintiff has breached provisions of the governing documents of CLVCA, which prohibit residents from being a nuisance or annoyance. (Doc. 49 p. 9.) Defendants claim that they have suffered and are continuing to suffer a variety of injuries as a result of the claimed breaches of contract and thus request a preliminary injunction prohibiting Plaintiff from engaging in certain activities.

## FINDINGS OF FACT

Cedar Lakes Village (CLV) is a neighborhood of residential condominiums in Wichita, Kansas. As a condominium, the owners of the individual units collectively own the real property and improvements, with exclusive ownership and rights to the possession and use of their individual units and the adjoining "limited common areas." They each have an undivided interest in common areas, which include walkways, park areas, including an area along a lakefront, trash gazebos, and a clubhouse with a swimming pool and tennis courts.

CLVCA, a corporation, is the body that acts on behalf of the owners as to their common interests. The owners are analogous to stockholders in that corporation. Dues are collected from the owners and applied by CLVCA to maintenance and repair of the common areas and the individual units. CLVCA is governed by a Board of Directors elected by the owners. The property is managed by a management company under contract with CLVCA.

CLVCA was incorporated in 1977 (Articles of Incorporation, Exh. 401). It is governed by its Articles of Incorporation (Exh. 401), its Bylaws, restated Declaration and other rules, contained in two documents: the "Gold Book" (Exh. 402) and the Rules, Regulations and Policies of Cedar Lakes Village Condominium Association (Exh. 303).

The relevant facts focus on the conduct of CLV resident Jerry Berg, Plaintiff in this case. Plaintiff is a large man – perhaps 6'7" and 370 lbs. He is, by his own admission, a loud person. This is especially true when he is in a dispute. When engaged in arguments, he tends to invade the personal space of the person with whom he has the disagreement. He has legal training. A former attorney, he was disbarred from practicing law in 1998. He holds a Kansas commercial real estate license. He is 64 years old. In 1983, he was convicted of misdemeanor battery on a former spouse. He has never been convicted of a sex crime. He was disbarred, however, for engaging in sexual conduct with clients, and his real estate licensed has been reviewed, but not revoked, because of alleged sexual misconduct. Plaintiff has firearms in his home.[1]

## Plaintiff's Tenure as Property Manager

---

[1] The record is not adequate for the Court to determine whether or not Plaintiff's possession of firearms is in violation of 18 U.S.C. § 922(g) in light of his misdemeanor assault conviction. Plaintiff is urged to seek legal advice concerning this issue.

Plaintiff and his wife have been residents of CLV since at least 2001. Plaintiff owned a property management company with another owner, and in 2003 that company was contracted by CLVCA to manage the condominium property. Plaintiff was the resident manager for his management company during that period. Plaintiff's work as manager was marked by complaints from residents.

Resident Lynn Finch complained that Plaintiff was in her backyard unannounced and saw her through her window as she got out of the shower. (Plaintiff's wife was also present.) She testified that her complaint concerning that incident resulted in stalking by Plaintiff, including the "keying" of a friend's car.

Resident Gina Hall complained that in 2004, Plaintiff made an off-color sexual comment to her when he was at her home for a repair. She claims that a man was peeping in her window in 2003, but that she did not realize it was Plaintiff until later. Ms. Hall testified that after her complaints about Plaintiff, he followed her around, including to her place of employment, followed her brother, and took her picture. She testified that he called her repeatedly. She obtained a Protective Order against him.

Resident Gina Ibarra complained that soon after she voted against gutter repair assessments proposed by Plaintiff as property manager, she discovered him

outside her bedroom window at 3 A.M. during a rainstorm dismantling her gutters.[2]

Resident Mary Jean Berg (no relation to Plaintiff) complained of an off-color sexual comment made by Plaintiff during a repair visit.  Resident Cindy Shoeppel complained in 2005 that Plaintiff made an off-color sexual comment when he was at her house for a repair.

During this period, Berg got into a dispute with resident Vance Hall concerning litigation to evict the boyfriend of his sister, Gina Hall.  Hall described retaliation against him, including an incident in which Berg told him, "You have no idea who you are f**king with and what I can have done to you and your family."[3]

## Events Leading Up to Contract Termination

In 2007, resident Jon Frobish[4] sued the Board and its members in a derivative action.  On March 18, 2007, that action was dismissed, and the Board was awarded attorney fees against Frobish.  (Exh. 12, 13, 16, 17.)  Plaintiff

---

[2]  Plaintiff and another witness offered a plausible explanation for this event.

[3]  The above facts are relevant only as background.  The breach of contract claim, under Defendants' theory of the case, is based on Plaintiff's conduct after the termination of this management contract in 2008.  Coincidentally, claims prior to 2007 would be barred by the applicable statute of limitations.  K.S.A. § 60-511.

[4]Mr. Frobish is a sometime board member, sometime attorney for the CLVCA, and a Defendant in this case.

testified at that hearing, and his testimony contributed to the dismissal. Mrs. Berg testified that this surprised and disappointed Frobish, who prior to that had been Plaintiff's ally. Plaintiff contends that his performance during Frobish's lawsuit resulted in a rift between them that led to the termination of the management contract. Also in 2007, sometime CLVCA Board member Jay Mandt brought an action against the Board, Plaintiff, and others concerning election practices.

Resident Cindy Schoeppel's difficulties with Plaintiff began when he was property manager. During a meeting in which Plaintiff was talking about how much money his company had saved the CLVCA, Schoeppel argued with him, and told attendees at the meeting that Plaintiff's co-manager had been sued by his mother for illegal taking her property. Plaintiff was livid and demanded to know how Ms. Schoeppel got her information. When she tried to leave the meeting, Plaintiff blocked her and physically slammed her into a door. He threatened to implicate her in a burglary, drove repeatedly in front of her house, parked in front of her house, and made a threatening hand gesture. In October of 2007, Schoeppel filed a Protection from Stalking Petition against Plaintiff in State Court. The Court found that Ms. Schoeppel proved the stalking allegations, which resulted in a Final Protection from Stalking Order effective for one year. (Exh. 455, Exh's. 9 and

10.)[5]

## Events Since Contract Termination

On April 15, 2008, CLVCA gave 60 days notice of termination of the contract between CLVCA and Plaintiff's management company "without cause." Then Board President Frobish, testifying at this hearing, listed as reasons the past complaints concerning Plaintiff by women, Plaintiff's hiring of his wife without Board approval, Plaintiff "injecting" himself as corporate representative during the defense of litigation by Gina Hall and billing $50 an hour, the writing of threatening letters, and Plaintiff's purchase of windows for his own unit.

Plaintiff was stunned by the termination of the contract, and went to Frobish's home and pleaded for the reinstatement of the contract. Plaintiff told Frobish that they would be sorry and that Plaintiff was going to destroy the community.

After the termination of the contract with Plaintiff's management company, Mrs. Berg came to resident Vance Hall to plead for his assistance in reinstating the contract. She warned Hall that if the contract was terminated there would be

---

[5] An effort by Ms. Schoeppel to enforce the Order with an alleged contempt charge in the summer of 2008 failed when the issuing Court ruled that Plaintiff had not violated the Order. Plaintiff was awarded fees for that hearing. (Exh. 19.) These court actions are part of the facts of this case. This Court is not bound by the conclusions in that action.

warfare in the community which would not end.

In May 2008, Plaintiff and his wife were in charge of publishing "The Cedar Reader," a neighborhood newsletter. At that time, Plaintiff published unfavorable comments in the Cedar Reader concerning Jon Frobish's decision to pay a personal judgment against him in the Mandt case with a CLVCA insurance claim. Frobish's reaction to this was angry, and nearly violent. He pounded on Plaintiff's door, and shouted and cursed at Mrs. Berg when Plaintiff was not present. He located Plaintiff in the front yard of another resident, and yelled and cursed at him. The event nearly, but did not, result in violence. In this instance, Plaintiff's conduct was more controlled than that of Frobish. (Exh. 82.)

On June 16, 2008, a new Property Management Agreement was entered into with Cross Real Estate Management (CREM). (Exh. 9.) On June 24, 2008, CLVCA sued Plaintiff's management company, claiming a failure to turn over documents for the management transition. An *ex parte* injunction was obtained the day the case was filed ordering the records to be turned over. The case was dismissed on July 16, 2008. (Exh. 22.)

In 2008, CLVCA sued Plaintiff Berg and his company, CB Management, to recover monies taken by the company as indemnification for the cost of defense of the Schoeppel stalking case. This issue arose when the expenditure was

discovered, sometime before the August 19, 2008, meeting. The Board had repeatedly denied Plaintiff's request for indemnification. Plaintiff later won this issue in a jury verdict.

On August 19, 2008, Plaintiff and his wife attended the monthly meeting wishing to discuss with the Board the dispute concerning the attorney fee reimbursement Plaintiff's company had taken from CLVCA funds. They were on the heel of the docket. After three hours, the meeting was adjourned and the remaining docket was continued to a meeting scheduled for August 26, 2008. The Bergs attended the August 26th meeting, also prepared to discuss the issue. After another three hours of meeting, President Frobish attempted to end the meeting without allowing Plaintiff to speak. Plaintiff insisted on addressing the Board. Frobish called Plaintiff a "thief" and a "liar." Plaintiff became angry and loud, and demanded to be heard. Frobish "gavelled him down," and said the issue should be discussed with their attorney. Plaintiff advanced toward the table where the Board members were sitting, dramatically moving two chairs out of his way ("forcefully and aggressively" according to Chris Brubaker). Plaintiff's wife and a friend calmed Plaintiff down and he retreated. The police were called.

On October 24, 2008, a hearing was held in State Court on an injunction request by CLVCA to prevent Plaintiff from attending meetings. This request was

denied. A limited Order was entered prohibiting Plaintiff from certain contact and interference with Board members. (Exh. 23.)

On November 2, 2008, Board member Chris Brubaker observed a confrontation between Plaintiff and octogenarian Board member Farrell Warren, who was delivering the neighborhood newspaper, in which Plaintiff "had Farrell smashed up against the garage up there, and . . . poking him in his chest repeatedly."

On July 31, 2009, a jury verdict was returned in CLVCA v. Berg and CB Property Management (Case No. 08-CV-3146), rejecting CLVCA's breach of contract claim which demanded the return of the indemnification monies. Following the loss, CB Property Management was awarded $80,000 in attorney fees under the fees provision in the contract. (Exh. 25, 26).

In November 2009, a modified photograph of resident Gina Hall's face transposed over a nude body was distributed to some residents. Greta Ibarra received one in her mailbox, stamped but not postmarked. Ms. Hall found one on the street in front of her home. She reviewed security video footage and saw Plaintiff's Sports Utility Vehicle in front of her house and the item being thrown out of the window. (Exh. 411.)

On December 10, 2009, an evidentiary hearing resulted in a finding that

Frobish had failed to prove his personal stalking action against Plaintiff. (Case No. 09-DM-7453; Exh. 28.) The case was ordered dismissed.

In the early morning hours of December 13, 2009, the Clubhouse burned down (Exh. 76.). Frobish immediately accused the Bergs (and their friend Sylvia McCombs) of arson, both to their faces at the fire scene and to investigators. Frobish may have believed Plaintiff was the last person in the building. Police had to intervene at the scene between McCombs and Frobish. The fire was later ruled accidental by the Fire Marshall. There is no evidence that Plaintiff, Mrs. Berg, or anyone else, intentionally started the fire.

On December 21, 2009, Plaintiff went to the property manager's office and requested documents related to the rental of the clubhouse the night of the fire. He considered the rental arrangement that night suspicious. When the property manager refused him some of the documents, Plaintiff became belligerent, and got "nose-to-nose" with the manager Gary Fugit. He refused to leave until the documents were produced. The manager asked Plaintiff to sit in the lobby, which he did. Plaintiff called the police. Board Member Sylvia McCombs arrived to assist with getting records. Plaintiff eventually received documents through the police.

On December 21, 2009, residents Susan Leasure, Jon Frobish, Jane Belt,

Marijean Berg, and Chris Brubaker all filed new protection from stalking actions against Plaintiff, obtaining *ex parte* restraining orders. Frobish acted *pro se*, and represented the other four as counsel. Frobish dismissed his case on January 4, 2010. The other four actions were all dismissed by Frobish on behalf of his clients on April 29, 2010, by agreement with Plaintiff. (Exhs. 30, 31, 33, 36.) These were filed within an hour of the filing of the Journal Entry of the December 10, 2009, hearing dismissing the previous Frobish case, so the temporary restraining orders from this case became effective as soon as the previous one was dismissed.

On January 10, 2010, at a meeting not attended by Plaintiff, Frobish confronted and yelled at Sylvia McCombs for providing documents to Plaintiff on December 21, 2009. Board members Greta Ibarra and Chris Brubaker cursed at Ms. McCombs, calling her a "bitch" telling her to "f**k herself. The Board "revoked" Ms. McCombs privilege to see records.

In 2010, Plaintiff participated in an effort with the Kansas legislature to pass a law which gave greater protection to homeowners in common interest communities. The effort resulted in the passage of the Kansas Uniform Common Interest Owners Bill of Rights Act, K.S.A. § 58-4601, *et seq*. That Act, commonly known as KUCIOBRA, became effective on July 1, 2010.

On March 3, 2010, Property Manager Gary Fugit from CREM, following a

records demand from Plaintiff, wrote an e-mail to Frobish as counsel for CLVCA expressing concern that Plaintiff might be violent in his encounters with the management company. Fugit requested that Plaintiff not come to his office. (Exh. 412.)

In 2010, Plaintiff filed an action against CLVCA and others in State Court (Case No. 10-CV-0339). This action included claims that he was being denied access to records to which he was entitled, and claims that he had been improperly assessed $4,044.99 in 2010 by the Board. A counterclaim by CLVCA requested an injunction against Plaintiff for harassment. (Exh. 39, 40.) Case No. 10-CV-339 resulted in summary judgment in favor of CLVCA on all issues. On September 24, 2010, CLVCA and Frobish were awarded fees against Berg in the amount of $3,526.97 and $1,414.50, respectively. (Exh. 44.) These fee awards have been "assessed" against the Bergs property by CLVCA. (*See* Doc. 50.) In another action, filed in July of 2010, Frobish and others filed for, and were denied, injunctive relief against Plaintiff. (Case No. 10-CV-2682; Exh. 47.)

On August 17, 2010, a meeting was held in a substitute location (the clubhouse at the Aragon neighborhood) due to the fire at the CLV clubhouse. The members were shown a set of architectural drawings for a proposed new clubhouse. The drawings were passed around the room. When the meeting

concluded, Plaintiff was in possession of the drawings. CLVCA Secretary Susan Leasure asked Plaintiff to return the drawings, and Plaintiff refused. Jon Frobish, who was representing the CLVCA at the time in a lawsuit against Plaintiff, arrived at the meeting late for the purpose of discussing discovery with his clients. He saw the disagreement concerning the documents, and confronted Plaintiff physically, trying to take the drawings away. Other members surrounded Plaintiff.

Frobish, at 5' 9" and 160 lbs., is much smaller than Plaintiff, who is 6' 7" and 370 lbs. Plaintiff "played keep away" from Frobish, raising the documents in the air, changing hands, and putting them behind his back. Another member grabbed the documents from Plaintiff when he put them behind his back.

Frobish struck Plaintiff on the body with a fist during this encounter. Plaintiff claims he was struck in the mouth as well. Plaintiff then stuck Frobish hard under the chin, either with a fist or forearm, and sent Frobish flying across the room, landing on the floor, senseless. When Frobish came to, he attacked a man who was leaning over him, and may have briefly re-engaged Plaintiff, before he calmed down. The police were called. During this fracas, an encounter also occurred between Mrs. Berg and Frobish's mother in which Mrs. Frobish struck Mrs. Berg in the back.

On August 18, 2010, Frobish filed another *pro se* Protection from Stalking

Petition against Plaintiff and obtained another *ex parte* temporary order (Case No. 10-DM-6169).  At the hearing on the temporary injunction on December 9, 2010, the Court continued the hearing to January 27, 2011, and recorded that the case would be dismissed if no further problems occurred.  Frobish failed to appear at the January 27, 2011, hearing and the case was dismissed.  (Exh. 51, 52, 53.)

On December 23, 2010, Frobish published an e-mail to residents expressing frustration with the CLVCA Board for setting aside a fine it imposed on Plaintiff arising out of the August 26, 2010, incident.  He called the Bergs "condo terrorists." (Exh. 99.)

On March 1, 2011, CLVCA published some proposed rule changes regarding what records must be provided to a member on demand.  March 4, 2011, Plaintiff sent an e-mail to residents objecting to the proposed rule changes and arguing that the changes violated the newly enacted KUCIOBRA.  This e-mail is civil in tone.  (Exh. 106.)  Also on March 4, 2011, Plaintiff learned that CLVCA had filed a lien against his home.

On April 9, 2011, a fire occurred in a shed at CLVCA.  Evidence presented by Plaintiff established that he was out of town at the time.  (Exh. 115.)  There is no evidence that Plaintiff had anything to do with the fire.

On April 13, 2011, Plaintiff and Frobish exchanged e-mails concerning

documents Plaintiff requested to examine from the property manager, including

documents Plaintiff already had.  Plaintiff claimed, "Just because I have copies

does not mean that CLVCA does not have to produce the same records it has to

keep."  (Exh. 153.)  Also on this day, Plaintiff and his wife viewed records at the

management company and photographed a record they contend proves fraud

related to the attorney fee assessment and lien against them.  Frobish knew Plaintiff

had reviewed records at the property manager's office that day.

That evening, Plaintiff stood outside Frobish's mother home (also in CLV)

and took pictures of some repair work being performed.  Frobish had recently

become involved with assisting the maintenance planning for the property manager

and, Plaintiff claims, had moved his mother's repair up on the list when the Bergs

required the same repair at their house.  Plaintiff claims he was documenting this

by taking pictures to show another Board member.  This action was intended to

aggravate Defendant Frobish, and it did.  Frobish saw Plaintiff from his mother's

kitchen window and became enraged.  He went to the garage and picked up a flat

iron prybar.[6]  Frobish confronted Plaintiff, demanding that he stop taking pictures

and leave his family alone.  A verbal confrontation ensued, with both men

---

[6] A great deal of controversy exists between the parties concerning the irrelevant
question of whether this object is properly called a "crowbar."

becoming loud.  A dispute exists in the testimony concerning what happened next. Frobish contends that Plaintiff backed him against the corner of a building.  Berg denies this, and contends the confrontation was verbal.  In any event, Frobish then hit Plaintiff with the prybar.  Frobish claims that during this, Plaintiff continued to advance on him, chest-bumping him, which Plaintiff denies.  Plaintiff was hit several times, causing bruises and cuts to his body.  The police came and Plaintiff was taken to the hospital.  He was not seriously injured.[7]  Lynn Finch and Ulla Frobish testified that afterwards Mrs. Berg threatened to kill Mrs. Frobish.

On April 25, 2011, Frobish filed another *pro se* Protection from Stalking Petition against Berg (Case No. 11-DM-3101).  Frobish, as counsel, also filed another Protection from Stalking Petition on behalf of Brubaker (Case No. 11-DM-3105).  Again, *ex parte* orders were obtained.  (Exh. 54, 56.)

On August 11, 2011, in the Frobish stalking action (Case No. 11-DM-3101), the State Court denied a request by Plaintiff to attend Board meetings, but ordered that Mrs. Berg be allowed to attend and video or audio record the meetings.  (Exh. 71-6.)  A similar order was entered in the Brubaker action at the same time.  (Exh. 58.)

The September 2011 Cedar Reader includes an article, written by Jay Mandt,

---

[7] This incident is the basis of Plaintiff's assault claim in this case.

reporting that "insomniac" CVL members had reported seeing a "370 lb. male prowling the property in the middle of the night dressed all in black. The black clothing suggests that this fat ninja is a prowler, not someone taking a nocturnal stroll." The article concluded with warnings about locking doors and other security issues. The article was accompanied by a picture of an unidentified person from above the waist covered all in black, including the head, with only his eyes showing. (Exh. 4.) Mandt testified that there had been actual reports, but no effort was made at the hearing to support this allegation.

On September 25, 2011, the police were called concerning an incident in which Mrs. Berg claimed she was denied access to a Board meeting in violation of the Court Order in Case No. 11-DM-3101 (the Frobish action). (Exh. 70.) The Board took the position that the Orders in the Brubaker and Frobish stalking cases did not govern the Board or CLVCA. This position was later affirmed by the State Court. (Exh. 58.)

On December 31, 2011, Plaintiff issued a flyer critical of the Board and especially Board member Mandt. He called Mandt a "thief" and a "liar." The flyer includes a rules-based argument that Association funds were being misused. The language of the flyer is colorful, verbose, impolite and vitriolic, but not vulgar or threatening. (Exh. 456.)

On January 13, 2012, the State Court dismissed the Brubaker stalking case for failure to prove that Brubaker personally, as opposed to the CLVCA Board generally, was a target of stalking. The Court also observed that some of the conduct complained of was already restrained in Case No. 10-CV-0339. (Exh. 57.)

On February 26, 2012, the State Court denied Plaintiff's motion to hold Chris Brubaker in contempt of its August 11, 2011, Order (Case No. 11-DM-3105) arising of the refusal of CLVCA to allow Mrs. Berg to attend meetings on August 16, September 20, and September 25, 2011. The Court ruled that the actions of CLVCA, as opposed to Brubaker, caused the action and were not enjoined by the Order. (Exh. 58.)

On March 6, 2012, Mrs. Berg was physically prevented from attending a special meeting of the CLVCA by a locked door, and then by Jay Mandt who physically blocked the door, making physical contact with Mrs. Berg, when she tried to enter. At this time the Board was taking the position that the Bergs' failure to pay an assessment resulted in losing their right to attend meetings.

**Events Occurring Since the Filing of the Present Action**

On March 30, 2012, Plaintiff filed the present action by Petition in Sedgwick County, Kansas, District Court. On April 5, 2012, Defendants removed this case to

Federal Court based on Plaintiff's Federal Fair Debt Collection Practices Act claim. (Doc. 1; Doc. 1-1.)

On April 12, 2012, Plaintiff filed an action in State Court (Case No. 12-MV-177) requesting "Judicial Review" of the purported lien on his property. This action concerned the "Statement of Assessment Lien" filed by CLVCA claiming a lien for an assessment in the amount of $9,248.47. (Exh. 59.) This action resulted in an Order invalidating the lien, also entered on April 12, 2012. (Exh. 60.) Someone – presumably CLVCA – was allowed to intervene in this matter, but a request to alter or amend the judgment was denied. (Exh. 61.)

On May 7, 2012, Plaintiff sent an e-mail to residents complaining about money being spent by CLVCA defending the current lawsuit brought by Plaintiff for records, and about CLVCA refusing to settle the lawsuit. (Exh. 457.) The e-mail is critical and somewhat vitriolic, but not threatening, vulgar, or personal.

On May 10, 2012, Plaintiff sent an e-mail to an attorney representing Defendants in this case complaining about the ethics of representing multiple Defendants and with a link to an article entitled "Attorney in homeowners associations probe found dead." The linked article reports the apparent suicide of a Nevada attorney being investigated. (Exh. 119, 420.) This e-mail was intended to intimidate the attorney.

On May 13, 2012, Brubaker and Plaintiff had a confrontation near, or possibly on, Brubaker's limited common area which basically consisted of growling and posturing.

On May 24, 2012, after pending for over a year, the State Court dismissed the Frobish stalking case (Case No. 11-DM-3101), partly because it was "duplicitous" with another civil case, presumably No. 10-CV-0339. (Exh. 55.)

On July 21, 2012, Plaintiff sent an extensive e-mail to property manager Troy Palmer complaining about the Board's "selective enforcement" of rules regulating window coverings. Plaintiff did not receive a letter regarding his windows and was apparently not involved in this issue. Notwithstanding this, he complained at length about persons who are and who are not in violation and ascribed corrupt motives for the uneven enforcement. He ended this e-mail with a picture of three boars' rears and testicles with the title "CLVCA Board of Directors." (Exh. 475.)

On July 22, 2012, a fire started in a neighborhood trash gazebo. No evidence was presented concerning the cause of this fire.

On August 14, 2012, the undersigned Magistrate Judge held an evidentiary hearing on Plaintiff's Motion for Preliminary Injunction limited to the question of whether the Bergs should have access to CLVCA meetings and records while this

case is pending.  CLVCA argued that Plaintiff and his wife had been properly

barred from meetings and from obtaining records for failure to pay assessments

based on the State Court awarded attorney fees in Case No. 10-CV-0399.  (Doc.

39, 46, 50.)

On August 17, 2012, the Magistrate Judge issued a Report and

Recommendation to the District Court recommending that Plaintiff's motion for a

preliminary injunction be granted, and that he be permitted to attend meetings and

have access to records.  (Doc. 50.)  Upon objection by Defendants (Doc. 57) and

Order from the District Judge, the Magistrate Judge reconsidered, and affirmed that

recommendation on November 19, 2012.  (Doc. 109.)

On September 29, 2012, Plaintiff sent an e-mail to management company

employee Teresa Gobel.  Therein, Plaintiff complained about defense counsel and

parties in this present lawsuit, discussed his struggle with "sexual addiction," and

complained about other events and issues with CLVCA and its board members.

(Exh. 407.)

CLVCA had a meeting scheduled for October 16, 2012.  Plaintiff, who was

still under the Board's "suspension," arrived early for the meeting and refused to

leave.  Plaintiff used the Magistrate Judge's Report and Recommendation as

support for his attendance, and it is unclear whether he told persons it constituted a

Court Order.  The police were called.  Rather than deal with Berg's presence at the meeting, the meeting was cancelled.  (Exh. 101.)

In October 2012, present counsel for Defendants sent a packet of derogatory information regarding Plaintiff to CLVCA residents.  On October 17, 2012, Resident Lori Osborn wrote counsel thanking him for being "reminded of how truly dangerous Mr. Berg is."  She called Plaintiff a "psychological terrorist." (Exh. 484.)

On October 29, 2012, Plaintiff sent an e-mail to management company employees Troy Palmer and Teresa Goebel about the consequences under the Bible of lying.  (Exh. 440.)  No context for this was provided to the Court.

On November 20, 2012, the Bergs were again not permitted to attend a meeting.

On November 23, 2012, Plaintiff issued an e-mail to various residents under pen name "Bubba Lee" which contained a series of re-captioned cartoons lampooning the association on several issues, including the positions it has taken in this action.  Some of the cartoons included offensive language or vulgar images. (Exh. 483.)

On December 15, 2012, Plaintiff sent a letter to the CLVCA Secretary announcing his intent to run for the CLVCA Board.  (Exh. 120.)

On December 17, 2012, Plaintiff e-mailed resident Kim Cross and chastised her for submitting an e-mail that was used as an exhibit in this case.  (Doc. 130-24.)  He then warned her about potential testimony in this case, giving her a "small taste of what your trial examination will be like."  He offered imaginary cross examination questions, and saying, "These are softball questions compared to what is really coming."  (Exh. 415-31.)

On December 27, 2012, and January 9, 2013, the parties in this case participated in a mediation with the Magistrate Judge.  No agreement was reached.

On January 13, 2013, Plaintiff issued an e-mail to various residents entitled "End High Dues and STOP MANDT."  This included an attachment accusing Mandt and Frobish of lying and causing legal fees and high dues.  It accuses the two of sabotaging a potential settlement in the present lawsuit.  The e-mail is vitriolic, but not vulgar.  (Exh. 458.)

In January 2013, the Bergs created a flyer in support of Berg's candidacy for the Board.  (Exh. 121.)  Mrs. Berg put copies on certain residents' doors, but Mandt followed behind her and removed them.  Mrs. Berg then mailed the flyers.

On January 15, 2013, Plaintiff sent a letter to counsel for Defendants stating that he intended to run for the Board.  He told the attorney, "I know you want to continue to stir up controversy and milk this to death.  I will be glad to oblige your

unethical, stupid, corrupt and immoral conduct until you lose your license." He insisted that the attorney "get off your lazy posterior and answer my demand letter. . . ." (Exh. 459.) Similarly vitriolic e-mails were sent to the same attorney on May 3, 2013, and August 20, 2012. (Exhs. 464, 479.)

On January 16, 2013, while walking his dog, Plaintiff was confronted by Defendant Frobish in the common area near Frobish's home. Frobish felt Plaintiff was inside an area that violated a distance prohibition from a State Court Order. The two had a loud and aggressive verbal confrontation, and the police were called.

In January 2013, the CLVCA Board solicited and obtained a list of residents who, it claimed, wished not to be contacted further by Plaintiff. On February 1, 2013, counsel for Defendants sent Plaintiff a letter containing a "no-contact list" of residents. The Board acted to authorize fines for violations of the "no-contact" list. (Exh. 497.) One member, Tracy Jackson, agreed to be listed because she was mislead concerning, or misunderstood, the purpose of the list.

Sometime before February 5, 2013, a Notice of a Special Member's Meeting was issued. The agenda at this meeting was to present two amendments to CLVCA bylaws. The first would bar any resident who owed money to the Board from seeking election to the CLVCA Board. The second was to allow the Board

authority to ban from the common areas any person who "reasonably poses a threat to the health or safety of any resident." (Exh. 129.) These actions were clearly directed at Plaintiff.

Plaintiff attempted to attend the February 5, 2013, meeting, although he was still under the association's ban from meetings (the Order from this Court had not yet been issued). Plaintiff wanted to attend because he perceived the two bylaw amendments to be directed at him. The Board locked the clubhouse doors to prevent the Bergs from attending. Board member Jay Mandt tried to open the door from the inside to let others in, and separate altercations occurred when Mr. or Mrs. Berg attempted to enter by force in front of another resident. Resident Kim Cross was unable to enter the building for the meeting because Plaintiff blocked her way and physically knocked her out of the entrance.

On February 15, 2013, Plaintiff sent a particularly vulgar and offensive e-mail, with attachments, to some residents attacking Mandt. Although the message was not sent directly to Mandt, he was told about it by others. It also attacked Mandt's father and grandfather with vulgar fictitious photographs, and attached an audio file of a song Plaintiff had discovered (which he did not write or record), entitled "Dick Head," which was intended to refer to Mandt. The song included lyrics stating that the singer wished the target of the song dead. Mandt was shown

the pictures, but had not listened to the song until the hearing.  He had, however, been informed of the song's content.  (Exhs. 845, 847-A.)  Plaintiff admits that sending these materials was probably not his "finest moment." This was intended to intimidate and threaten Mandt.  Mandt sent a reply to the neighbors on February 16, 2013.

On February 18, 2013, the neighborhood suffered another fire, this time in a dumpster.  On February 19, 2013, Berg e-mail to property manager demanding that video of the area be preserved to clear him of allegations.  (Exh. 463.)  There is no evidence connecting Plaintiff to this fire.

On March 11, 2013, after considering the parties' submissions, the District Judge adopted the Report and Recommendation ordering Plaintiff have access to meetings and records.  (Doc. 195.)

In late March 2013, Plaintiff wrote letters to certain residents on the "no-call list," warning that he would sue them if they failed to remove their names from the list.  (Exh. 488, 502.)  Resident Sherry Lincoln signed a letter provided by Plaintiff to have her name removed from the no-call list, but only after he screamed at her on her front porch and scared her.

In April 2013, resident Lynn Finch found 13 ½ inch footprints in the snow in her backyard, and followed them back to Plaintiff's residence.  She called the

police.

Resident Lori Osborn encountered Plaintiff when they were walking their dogs.  Plaintiff confronted her about the no contact list, which included her name, and warned that he would sue her if she did not have her named removed.  He was "in her face" in this encounter, raised his voice, and called her "unprofessional."  She had her name removed from the list, in part because her mother is in poor health.  Otherwise she would have preferred to be on the list.

On April 30, 2013, Plaintiff filed another law suit in this Court, which includes claims against persons on the "no call" list.  (Case No. 13-CV-1164-EFM-KGG.)

## General Complaints Regarding Plaintiff

Residents testified concerning various general complaints concerning Plaintiff.  These included that they fear[8] Plaintiff or find him intimidating

---

[8]  Some fears of Plaintiff appear to be based on rumors – some of which are either unfounded or untrue.  For example, Lynn Finch testified that she feels unsafe in the neighborhood, partly because Plaintiff was disbarred for "raping three women."  Although Plaintiff was disbarred for having sexual relations with clients, there was no express finding of rape.  *In Re Berg*, 264 Kan. 254 (1998).  Another example is the common notion and oft perpetuated rumor that Berg is responsible for the fires at CLVCA (Brubaker, Cross), of which there is no evidence.  Some residents, including defense witnesses, are not afraid of Berg, and some do not believe him to be a physical threat.  Some adverse attitudes about Berg have been enhanced by mailings from defense counsel which included allegations, such as arson, not proved in this hearing, or which re-transmit alleged Berg transmissions such as the fake "nude" photo of Hall. To some extent, the Defendants have intentionally enhanced the communities' fear of the plaintiff.

(Brubaker, Osborne, Schoeppel, Warren, Hall, Gebert, Frobish, Lincoln ), that they are unable to enjoy the neighborhood's common amenities because they do not want to encounter Plaintiff (Osborne, Schoeppel, Gebert), that they do not attend meetings because of Plaintiff's conduct at meetings (Schoeppel, Hall), or because of the general adversary nature of the meetings not necessarily related to Plaintiff (McIntyre, Jackson, Finch, Fenton), or they dislike the large number or content of flyers and e-mail sent by Plaintiff (Gebert, Osborne).[9]  Board member Brubaker observed Plaintiff break a security light on one occasion.  There have been 50 or 60 of these lights broken at CLV during the last few years.

Residents testified that living at Cedar Lakes has been unpleasant[10] (Osborne), and they would leave if they could (Schoeppel).  Witnesses generally agreed that the expense of the constant litigation has deprived the neighborhood of needed repairs and maintenance, and has caused the properties to deteriorate (Haines, Finch).  There is a general concern that the constant litigation and conflict  reduces the value of their properties or make them difficult to sell.  Some witnesses are offended or annoyed by the volume, tone, and/or content (especially

---

[9] Lori Osborne testified that Berg sends "volumes and volumes of crap."  She throws most of it away.  She "gets so much, it's unreal."  Some residents received offensive Berg e-mails as forwarded e-mails from others (Gebert).

[10] Lori Osborne testified that living at Cedar Lakes has "ruined [her] life."

if vulgar) of Plaintiff's frequent flyers and e-mails (Cross, Warren, Hall, Gebert). Resident Greta Ibarra described living at Cedar Lakes as "hell on earth." Some witness frankly admitted that they just do not like Plaintiff (M. Berg).

## Undated Complaints and Events Regarding Plaintiff

There are several mostly undated complaints that Plaintiff loses his temper easily during disagreements and yells at and intimidates those who disagree with him. He has retaliated against residents who oppose him by following them on foot and in his car, watching them from his windows with binoculars, jumping in front of their cars, or simply "staring" at them from the street. (Ulla Frobish, Gina Hall, Brandi Hall, Gebert, M. Berg, Lincoln.) Some of this testimony is nonspecific, undated, and subjective. There is sufficient testimony, however, to conclude that Plaintiff retaliates against persons who disagree with him through personal (though not generally physical) attacks and threatening conduct with an intent to intimidate.

The Wichita Police Department beat coordinator Officer Dautrich, who has been called to the neighborhood on several occasions, does not feel that Plaintiff or anyone else is a "threat" to the area. He feels there are just a lot of people who do not get along.

Some residents testified that their discourse with Plaintiff has been civil

(Randy Siroky).  Notably, Jay Mandt, one of Plaintiff's primary detractors, testified that their in-person conversations have been civil.  Residents also testified concerning neighborly actions by Plaintiff and his wife.  For example, he helped Lori Osborne find her lost dog and repair her fence.  Other evidence from the Plaintiffs addressed neighborly actions they have taken towards fellow residents.  Some residents do not object to receiving communications from Plaintiff, or just ignore them if they are offensive.  He does have friends in the neighborhood.

Employees of the two management companies testified concerning uncivil encounters with Plaintiff demanding records or services, and general belligerent conduct (Lemen, Fugit, Goebel).  Not all encounters were uncivil.  They also described receiving volumes of e-mails from Plaintiff, and repeated demands that he place documents in his file.  Troy Palmer estimated receiving over 500 e-mails in eighteen months.  Teresa Goebel, a female management employee, described an attempt at sexual banter by Plaintiff.  Some of the vulgar and offensive e-mails were sent to management company personnel.  (Exhs. 407, 413, 422, 485 – including the "Dick Head" song.)

Complaints also include that Plaintiff makes constant requests for maintenance, including requests that are unrelated to his unit.  Marijean Berg testified that when she was the Board's maintenance liaison it "was exhausting,"

and that she received one or two maintenance request e-mails each week from Plaintiff.

Residents also reported uncivil conduct and displays of temper by sometime Board member and Board attorney, and apparent Berg nemeses, Defendant Jon Frobish. Some of these displays were not in Plaintiff's presence or even prompted by issues related to Plaintiff (Hall). This included an incident in which Frobish "chest bumped" another director during a meeting (McCombs). Resident Elisabeth Haines (81 years old) testified that she spoke to Frobish after a meeting and he lost his temper and shoved her.

The Magistrate Judge finds, as a matter of fact, that Plaintiff, even when pursuing rights and interests legitimate as an owner, has done so in a manner which is *intentionally* annoying, threatening, and uncivil. This conduct is apparent from his conduct at meetings, in interactions with the management companies, in discourse with residents on the street, and in his written communications with residents. He has, since the termination of his company's management contract in 2008, intentionally been a nuisance. The evidence does not support a finding that Plaintiff is likely to actually physically harm his neighbors or their property, but his conduct has raised a reasonable fear of physical threat in neighbors he has personally confronted. He has not acted in good faith.

## Unsupported Factual Allegations

In support of their motion, Defendants made several factual claims in the "Historic Conduct" section of their memorandum that were unproven at the hearing.

The allegation contained in paragraph 4 concerning sexual misconduct was completely unproven at the hearing, and would be outside of the five-year statute of limitation for breach of contract. The alleged "peeping" incidents would also be outside of the statute, although they may have formed part of the reason for the termination of the management contract. No evidence was offered to support the allegations in paragraph 6 concerning Vicky Russell.

In paragraph 11, Defendants state, "In December, 2009, the clubhouse at Cedar Lake Village Condominium Development burned down. Berg was the last person seen leaving the clubhouse." This allegation, in which Defendants intentionally infer *to the Court* that Plaintiff was responsible for burning down the clubhouse, is made in bad faith. There is no evidence that Plaintiff was responsible for that fire, and Defendants know that the fire marshal concluded the fire to be accidental. The allegations in paragraph 19 are irrelevant because there is no evidence that Plaintiff was responsible for the other fires. No effort was made to prove the allegations in paragraphs 13 or 15. No evidence was presented that

Plaintiff "comes out of his condominium in the middle of the night wearing all black" (Paragraph 37) or that he shot a neighbor's dog (Paragraph 38).

Some of the other factual allegations were exaggerated or irrelevant. The Magistrate Judge considered relevant only the facts found herein.

### Testimony of Dr. Reidel

Defendants offered the testimony an expert witness, Dr. Reidel, a psychologist, to establish that Plaintiff is a psychopath and dangerous. The admissibility of this testimony is governed by Federal Rule of Evidence 702. That rule provides that expert testimony is admissible if the expert is qualified, the testimony will assist the trier of fact to understand the evidence and determine a fact in issue, is based on sufficient facts, is based on reliable principals and methods, and the expert has reliably applied the facts and principals to the case.

Dr. Riedel evaluated facts provided by Defendants concerning Plaintiff to determine if he is a psychopath and dangerous. He employed three risk assessment instruments, which he admitted are more commonly employed to determine the risk of re-offending by convicted felons. The information he was provided was not, he conceded, the type of information he would typically use in making an assessment. Some of the information is factually contested, and the Court lacks evidence to make definite conclusions concerning some allegations.

Dr. Riedel also analogized some information to information he would normally use. For example he considered an admonition from the Kansas Supreme Court to Plaintiff, which Plaintiff later violated resulting in his disbarment, a sort of "parole" analogous to criminal parole. He considered an account of sexual misconduct described in Plaintiff's disbarment a rape, although he normally would require evidence of a conviction. Nevertheless, he concluded that Plaintiff is "more psychopathic than 90 percent of the male offenders in the North American correction system." He opined that Plaintiff has a 10% higher chance of "reoffending" violently than the population.

The Court does not find that this testimony is helpful to understanding the facts or evidence. The tests used are not shown to be reliable for the present purpose. The testimony fails to establish that the type of evidence considered is the sort usually relied upon by experts in the field. Fed.R.Evid. 703. This is a breach of contract case. The Court has little difficulty, without expert testimony, concluding that Plaintiff is likely to behave towards the CLVCA as he has before. Plaintiff's objection to this testimony is sustained.

## FINDINGS AND RECOMMENDATIONS

Defendants have moved for a Preliminary Injunction (Doc. 179). In their motion Defendants request that the Court impose the following on Plaintiff:

1. he be restrained from communicating in any manner with defendants and neighbors who have placed their name on a "No Contact List;"

2. he be prohibited from disseminating vile and vulgar materials throughout Cedar Lake Village;

3. he be prohibited from attending any Board or Member meetings;

4. he be prohibited from threatening neighbors, the Board and Counsel; and

5. he cease extortion attempts.

Additionally, at the hearing Defendants added the following to their request:

6. Plaintiff be prohibited from contacting witnesses in this case; and

7. he be prohibited from filing additional lawsuits.

## The Standard

A motion for preliminary injunction must be determined under Federal Rule of Civil Procedure 65. The standard for granting a motion for preliminary injunction is well-established. The movant (Defendant) must establish (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) that the threatened injury to the movant in not receiving the provisional relief outweighs the harm the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely

affect the public interest. ***Greater Yellowstone Coal v. Flowers***, 321 F. 3d 1250,

1255 (10th Cir. 2003). An injunction which seeks to alter the *status quo*, such as

the relief requested in this motion, "must be more closely scrutinized to assure that

the exigencies of the case support the granting of a remedy that is extraordinary

even in the normal course." ***O Centro Espirita Beneficiente Uniao Do Vegetal v.***

***Ashcroft***, 389 F.3d 973, 976 (10th Cir. 2004) (*en banc*), *aff'd* 126 S. Ct. 1211

(2006).

## Substantial Likelihood of Success on the Merits

The first element Defendants must prove in order for the undersigned

Magistrate Judge to recommend the entry of a preliminary injunction is

Defendants' likelihood of success on the merits. ***Greater Yellowstone Coal***, 321 F.

3d at 1255. Defendants' Counterclaim upon which the current motion is founded

is an action for breach of contract. In the First Amended Counterclaim (Doc. 49),

Defendants claim that Plaintiff has breached provisions of the governing

documents of CLVCA which prohibit the residents from being a nuisance or

annoyance. (Doc. 49 p. 9.) Specific provisions of the governing documents were

cited in Defendants' memorandum. (Doc. 180.) These include Section 7(F) from

the Declaration which provides that:

> (F)     Risk and annoyance. No nuisances will be allowed
> upon the condominium property, nor any use or practice

that is a source of annoyance to residences or which interferes with the peaceful possession and property use of the property by its residents. All parts of the condominium will be kept in a clean and sanitary condition and no rubbish, refuse or garbage allowed to accumulate nor any fire hazard allowed to exist. No apartment owner will permit any use of his apartment or make any use of the common elements that will increase the cost of insurance upon the condominium property.

(Exh. 20, Declarations ¶ 7(F), p. 6.) Additionally, Section 7(G) of the Declaration provides as follows:

(G) Illegal or offensive conduct. No improper, offensive or unlawful use will be made of the condominium property nor any part of it; and all valid laws, zoning ordinances and regulations of all Governmental bodies having jurisdiction will be observed. The responsibility meeting the requirements of Governmental bodies for maintenance, modification or repair of the condominium property will be the same as the responsibility for the maintenance and repair of the property concerned.

(Exh. 20-Declaration 7(G), p. 6.) Additionally Paragraph 14 of the Rules, Regulations & Policies provides as follows:

14. **Personal Conduct and Nuisances:** Condominium living is different from more common and traditional arrangements. Homeowners own their unit, but also own the building itself and all of the grounds in common with the other homeowners. This gives each homeowner a property interest in the use of the other units, and the right to expect reasonable standards of conduct to be maintained, as are determined by the elected Board of Directors on behalf of all members. Homeowners must

respect the right of their neighbors to live peaceful and secure lives without undue nuisances or disturbances. Homeowners should refrain from activities that impose unwanted annoyances or nuisances on their neighbors. Their guests must observe the same standards. The Board of Directors has authority to enforce these standards through warnings, fines, etc. (*See Enforcement of Association Policies)*:

**C. Noxious or offensive conduct**, including the use of obscene or profane language, which disturbs the peace of the community, is prohibited.

(Exh. 20, Rules, Regulations & Policies, ¶ 14, p. 8.)

Plaintiff does not take issue with the contention that these provisions are contractual. Rather, he argues that his activities are protected by KUCIOBRA, K.S.A. § 58-4601 *et seq.* He specifically cites provisions in that Act which require that an association establish a method for unit holders to communicate among themselves and with the Board (§ 58-4608(a)(5) and 4616(a)(3) & (b)), protect the rights of unit holders to assemble to discuss matter of common interest (§ 58-4617(e)), to comment on association matters during meetings (§ 58-4611(e)), and the right of notice to members of special meetings (§ 58-4611(b)). He cites the Act generally for the protection of his right of speech, press and grievance.[11]

_____

[11] CLVCA is a private organization governed by contract and, thus, is not directly restrained by constitutional protections for free speech and assembly which would limit a governmental organization.

KUCIOBRA was passed to govern the rights and interests of unit holders in common interest communities. Its express purpose is to "establish uniform rules of law to clarify the rights and duties of unit holders and associations . . ., to provide for the effective operation of common interest communities in the interests of their owners and their residents and to address current and potential areas of conflict and tension between unit holders and associations, boards and managers in a comprehensive and balanced manner." K.S.A. § 58-4601©. The rights provided in the law take precedence over provisions in declarations or bylaws. K.S.A. § 58-4603(a).

The ownership and management of an association managing common interest property is a matter of private contract. KUCIOBRA impliedly recognizes that, in some respects, such associations have functions similar to a small town council, and creates some owner rights analogous to a citizen's rights. Those include the right to participate in the discourse concerning community issues and in the management of the association.

Such rights only exist, however, to the extent they are exercised in good faith. The Act specifically provides that "[e]very contract or duty governed by this act imposes an obligation of good faith in its performance or enforcement." K.S.A. § 58-4604. The Court finds that Plaintiff has not exercised his rights in good faith.

To the contrary, he has intentionally and maliciously abused his rights under the Act.

Plaintiff has breached the terms of his contract. It may be difficult to interpret the "nuisance" and "annoyance" provisions of the Bylaws and Regulations to cover a resident's personal conduct. Less difficulty is presented, however, when the resident, as in this case, is *intentionally* being a nuisance and annoyance. The contractual prohibition on "noxious or offensive conduct" which "disturbs the peace of the community" must be read as subject to the rights protected in the Act. However, when those rights are not exercised in good faith, and when the conduct is intentionally noxious and offensive, there is no conflict and the behavior constitutes a breach. Defendants are, therefore, substantially likely to prevail on their claim that Plaintiff has breached the terms of his contract with his neighbors by intentionally being an annoyance and nuisance.

### Irreparable Harm

The next element Defendants' must establish is whether the failure to provide the relief requested will result in irreparable harm. ***Greater Yellowstone Coal***, 321 F. 3d at 1255. Evidence was presented to establish the harm to the community caused by Plaintiff's conduct.

Testimony established generalized concern that the value of the properties in

the neighborhood, or their marketability, is depressed by the turmoil surrounding Plaintiff. Testimony also indicated that the disputes with Plaintiff have consumed so much of the time and resources of the association that maintenance and other normal operations of the association have been crippled.

Other testimony established that for some residents either the fear or unpleasantness of encountering Plaintiff in the common areas or at meetings has resulted in the abandonment of those amenities. The fear of Plaintiff is caused by a combination of Plaintiff's personal conduct, his personal history, and rumors and misinformation perpetuated by his opponents. Nevertheless, it is clear that the atmosphere created primarily by Plaintiff's conduct has resulted in an understandable diminishment of the use of the property by some residents. The Court does not find that the evidence establishes that Plaintiff is "dangerous" in the criminal sense, although his conduct does cause fear in some, and is intended by Plaintiff to do so.

The inability of the CLVCA Board or members to do business with Plaintiff present at meetings is clearly established. Equally clear is that Plaintiff has intentionally abused his right to communicate with, and demand information from, the management company, thus seriously impairing its ability to perform its functions. His unwillingness to deal with these entities in a reasonable and civil

manner is part of his intentional malicious effort to abuse his rights as an owner, and part of his on-going vendetta against the CLVCA.

The provisional relief requested will not stop the diversion of funds from association maintenance needs to litigation costs. Defendants have not requested an order temporarily banning the Plaintiff from common areas, and the Magistrate Judge is doubtful that remedy would be effective or reasonable at this stage. No provisional remedy will repair property or restore market value.

While some damages may be available for Plaintiff's past breaches of contract, and future orders of the Court may remedy future difficulties, the inability of the CLVCA, its members and Board, and the management company to perform current operations constitutes a present and irreparable injury – and one that can be meaningfully mitigated by ordering some immediate temporary relief in the form of limiting Plaintiff's access to meetings and limiting his communications with parties to this action.

### Potential Injury to Plaintiff of Granting Preliminary Relief

Limiting Plaintiff's access to meetings or members will harm him. He has rights to such access (if exercised in good faith) and legitimate interests in his property to protect. He, and the community as a whole, are also injured, at least theoretically, by the silence of his dissent. While on balance it is appropriate to

limit his activities pending the trial of this matter, some protective measures should be imposed upon Defendants to minimize the injury to Plaintiff.

Furthermore, any provisional remedy in this case should take into account the contribution to this situation by others. Plaintiff's conduct has not brought out the best in current and former Board Members. The two actual physical incidents – the "prybar incident" and the incident at the Aragon clubhouse – were caused in part by intemperate conduct by Mr. Frobish, who has substantially contributed to the dysfunction of meetings. Two other members, Mr. Brubaker[12] and Ms. Finch, were so evasive and hostile during cross examination that they had to be warned by the Court. Limitations on Plaintiff's participation should be paired with limitations and protections to limit the harm to him and his legitimate interests during the pendency of this case.

The Magistrate Judge recommends the following orders be in place during the pendency of this action:

1. During the pendency of this action, Plaintiff may not attend meetings of the CLVCA Board or membership. Neither may he run for CLVCA office. His wife, Sallie Berg, may attend all meetings, and shall be permitted to make an audio or video recording of meetings. She is authorized to vote his proxy. Her right to speak shall not

---

[12] On one occasion, after a meeting, Mr. Brubaker intentionally discharged a taser in the direction of Mrs. Berg to startle her.

be limited beyond those reasonable limitations placed on any other member.

2.    During the pendency of this action, Plaintiff shall communicate with Defendants in this action, or Defendants in Case No. 13-CV-1164, only through their attorneys.  This includes any requests for records or information from the management company.  This encompasses all communication, whether verbal or written.

3.    During the effective period of these restrictions, Jon Frobish will also not attend meetings or run for office.  His spouse may attend meetings, record meetings, speak, and vote his proxy.

4.    No Party in this case, Plaintiff or Defendants, may request any *ex parte* relief from <u>any</u> Court without fully advising the Judge from whom the relief is requested of the full history of this matter.  Providing a copy of this R&R shall suffice in that regard.

The remaining requests from Defendants are either inappropriate or would be ineffective.

The Court is not willing to recommend that Plaintiff be prohibited from filing lawsuits.  Remedies for filing frivolous lawsuits may be had in each case.

While CLVCA is not a governmental agency, and thus not strictly limited by First Amendment considerations, the Court is.  Thus, prior restraint of Plaintiff's communications by flyer, letter or e-mail, or restraining the nature of those communications, is inappropriate, except as stated in number 3, *supra*.  CLVCA

members who do not wish to be subject to Plaintiff's opinions are encouraged to disregard them.  Plaintiff is warned, however, that in the Magistrate Judge's opinion many of those communications, including personal contacts, because of their form, content, tone, volume, or frequency, have probably breached the contract with his neighbors.  The reluctance to enjoin those activities should <u>not</u> be mistaken by Plaintiff as encouragement to continue them.

The Court is sympathetic to the effort by the Board to create a "no contact list."  But soliciting members to sign on to a list to avoid communications with a "political" opponent of the Board, however obnoxious the opponent's behavior, may be contrary to the communications provisions of KUCIOBRA and not within the Board's legitimate activities.  The Court does not recommend the provisional enforcement of that effort.

The request concerning "threatening" neighbors and "extortion attempts," based on the evidence presented at the hearing, appears to be directed toward Plaintiff's threats to sue.  Enjoining such conduct would be impractical and ineffective.  Just as it would be inappropriate at this juncture to prohibit Plaintiff from filing suits, it would be inappropriate to prohibit him from "threatening" to do so.  Actual threats of violence or criminal extortion should be reported to the appropriate authorities.

Because Plaintiff is representing himself in this case, the Magistrate Judge is unwilling to recommend that he be prohibited from communicating with potential witnesses. Such an order would substantially impede his ability to represent himself. However, the Court cautioned during the hearing that some of the evidence concerning Plaintiff's contacts with witnesses, including a contact in which he attempted to dissuade a witness from testifying, were perilously close to witness tampering.[13]

IT IS THEREFORE RECOMMENDED to the District Court that Defendants' Motion for Preliminary Injunction (Doc. 179) be **GRANTED in part** as more fully specified herein.

Pursuant to 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of a copy of these proposed findings and recommendations to serve and file with the U.S. District Judge assigned to the case, written objections to the findings of fact, conclusions of law, or recommendations of the undersigned Magistrate Judge. The failure to file such written, specific objections within the fourteen-day period will bar appellate review of the proposed findings of fact, conclusions of law, and the recommended disposition.

---

[13] *See* Plaintiff's communication with Kim Cross cited in the facts herein.

**IT IS SO RECOMMENDED**.

Dated this 25th day of July, 2013, at Wichita, Kansas.

<div style="margin-left:40%">

 S/  KENNETH G. GALE_____
HON. KENNETH G. GALE
U.S. MAGISTRATE JUDGE

</div>